## NICINDA M. MAGEE ET AL. v. THOMAS CHADOIN.

Where a party had been admitted as a colonist, and had selected land for which there had been no order of survey, but the land had been surveyed among the surveys of the colony, whose archives were returned to the general land office, and the colonist received his certificate in 1838, and applied that certificate to the previous survey, and without any unnecessary loss of time he procured the field-notes, and had his survey certified to the general land office, and paid the dues when it was patented: *Held,* that this legal title was superior to a location made in consequence of a mistake of the commissioner of the general land office.

Where the commissioner of the general land office was mistaken as to the boundaries of a county, the claimant of land, depending on the commissioner's acts, ought not to be held responsible.

Where a colonist had a survey, but no order of survey, he was not embraced by the 12th section of the act of 1837, to reduce into one the several land laws, which required all orders of surveys of head-rights procured under the colonization laws, previous to the declaration of independence, to be submitted to the land commissioners. (Paschal's Dig., Art. 4140, Note 593.)

Where the 19th section of said land law was substantially complied with, under the instructions of the general land office, it was sufficient. (Paschal's Dig., Art. 4528.)

When no statute fixed the time of returning field-notes to the general land office, each case depended upon its own peculiar circumstances.

The first act fixing a time for the return of field-notes was passed on the 5th February, 1840, which required the return of field-notes by the first day of January, 1841, &c. This time was extended again and again, owing to the situation of the country. (Paschal's Dig., Arts. 4114 to 4119.)

Where field-notes had already been returned and rejected before the passage of the act, because of conflict with another survey, a second return was unnecessary.

The court will take judicial notice of the history of the country, in determining a question of laches.

Where parties located land with full knowledge of a prior equity, they and their privies are bound by such equity. Such locations were fraudulent, and could not be benefited by a patent.

If a former recovery be relied on, it must be shown that the trial was upon the merits, and involved and determined the subject-matter.

APPEAL from Fayette. The case was tried before Hon. L. W. MOORE, a special judge.

The history of the case is sufficiently given in the opinion of the court.

*Wm. G. Webb* and *John T. Harcourt* filed briefs for the appellants.

No brief for appellee has been furnished to the *Reporter*.

HAMILTON, J.—This case is in this court for the second time. It was heard at the Austin term, 1857, on writ of error from Fayette county, and was then reversed and remanded for further proceedings, and is now presented to us on an appeal from the same court below.

In the report of the case when here before, to be found in 20 Texas, 476, is a very full and accurate statement of the case as now presented, except such matter as has been added by subsequent amended pleadings, which, so far as we can see, have raised but one new issue, and that is a plea in bar of the appellee's claim of right, predicated upon an alleged former adjudication of the same subject-matter, between the same parties, in the district court of Fayette county, and which will be more particularly noticed hereafter.

The statement of the case, in this opinion, will be limited to just so much as is deemed essential to an intelligible understanding of the points to be decided.

The controversy is concerning a league of land situate in the county of Lavaca, formerly in the county of Fayette. The appellee came to Texas in 1829, as a colonist of Austin and Williams, and, being a married man, was entitled to a league of land, and made application for the league in controversy, which had, previous to his application, been surveyed by an authorized surveyor of the colony; his application was granted and placed on record in the proper office of the *empresarios*, and it only remained

for the commissioner of the colony to issue a title in form to perfect his right, which was prevented by the Texas revolution and the closing of the land offices by the consultation in 1835. Immediately after the reopening of the land offices in 1838, the appellee applied for and obtained his head-right certificate for a league of land from the board of land commissioners for Washington county, and applied it to the survey of the land made by Austin and Williams' surveyor, one William R. Hensley.

The application was made on the 24th June, 1835; his head-right certificate was obtained from the board of commissioners of Washington county within three months after the reopening of the land offices in 1838, and he then caused the field-notes of the said survey to be examined by the surveyor, Hensley, who certified them as correct, and had them proved by two chain-carriers, in order to perfect his claim; and on the 23d day of June, 1838, applied his certificate to said survey and paid all the government dues to the authorized receiver of Colorado county; and afterwards, about the 1st day of December, 1839, he forwarded to the general land office his field-notes, proved as stated, together with his head-right certificate, (which in the meantime had been examined and approved by the traveling board of land commissioners,) to the general land office for patent; but the field-notes were not admitted to record, because they were not examined in the county where the land lay, and because, also, of two locations which, in the meantime, had been made by Samuel and Jerome B. Alexander, covering all or the greater portion of said league survey, and which locations had been surveyed and the field-notes returned to the general land office and admitted to record. These locations of the Alexanders appear to have been made on the 3d day of January, 1839, in the county of Fayette, and upon which they obtained patents, respectively, the said Samuel Alexander

for one league of land, on the 9th day of February, 1840, and the said J. B. Alexander, for six hundred and forty acres, on 25th January, 1841.

The appellants deraign title from the patentees to Samuel and Jerome B. Alexander, and the appellee stands upon his prior equitable right.

There seems to have been no actual possession or occupancy of the land, or any portion of it, by either of the parties, until some time in the year 1850. Some time in the early part of that year the appellee placed his son in possession as his tenant, and soon thereafter the original plaintiffs in this suit, Nicinda Magee and her husband, Richard A. Magee, entered upon and took possession of a subdivision of six hundred and forty acres of the league which had been set apart to the said Nicinda, upon a partition made by order of the county court of Fayette county, in conformity to the bequests of the last will and testament of Jerome B. Alexander, who it seems had died after purchasing the league of land from Samuel Alexander.

In the month of October, 1850, the appellee commenced a proceeding before a justice of the peace of Lavaca county of forcible entry to dispossess Magee·and wife; whereupon they petitioned for the writ of injunction restraining the appellee from further proceeding in his said action before the justice of the peace; set up their own title, and denying any title, right, or possession in the appellee, and prayed that he might be cited to appear and answer in the district court of Lavaca county, and that the injunction against him might be made perpetual, &c. He appeared and answered, setting up his equitable defenses, after a motion to dissolve the injunction had first been overruled.

These proceedings were had in Lavaca county, in which the land is situate. In April, 1853, there was a change of venue, by agreement, to Fayette county, where, by amended pleadings, all of the appellants were brought into court and made parties.

A general exception to the appellee's defenses, which in the record is called a demurrer, having been filed, with a prayer to make the injunction perpetual, the cause was heard at the March term, 1854, of the district court of Fayette county, when the exception was sustained and the injunction made perpetual; and it was from this judgment that a writ of error was prosecuted to this court, which resulted in the decision before referred to, and which is reported in 20 Texas, 476.

To defeat the equitable title of the appellee, the appellants pleaded, in addition to the patents to Samuel and Jerome B. Alexander, under which they claim title, that the appellants never paid the Government dues on the survey claimed by him; that the land lay in the county of Fayette at the time of the location of Samuel and Jerome B. Alexander, and was vacant and unappropriated; that if the appellee ever had an equitable right to the land, he lost such right by his laches in not prosecuting the same within a reasonable time, a former adjudication, and an abandonment of his claim from 1847 to the commencement of these proceedings, in 1850.

The appellee set up his selection of the league of land as a colonist of Austin and Williams, made before the closing of the land office by the consultation in 1835; the survey of the same which had been previously made by Hensley, an authorized surveyor of Austin and Williams; the allowance of his application, and its record in the application-book of said *empresarios;* the issuance of his head-right certificate by the board of land commissioners for Washington county, immediately after the re-opening of the land offices in 1838, and its confirmation by the board of land commissioners to detect fraudulent land certificates; the certification of his field-notes by the surveyor, Hensley, and proof of the same by two chain-carriers; his application of his head-right certificate to the survey, and the payment of the government dues in the county of Colorado

on the 23d day of June, 1838, in which county he believed at the time the land was situate; that the line between said county and Fayette had not then been surveyed and determined, and was not known; and that he was induced to make the application of his certificate to the survey, and to pay the government dues thereon in Colorado county, because the commissioner of the general land office had sent to the surveyor of said county a certified copy of the field-notes of the survey of the land made by Hensley, being under the impression himself that the land lay within its limits, and that if there was a mistake it was not his fault, but that of the commissioner; that he had no knowledge that the land lay in the county of Fayette until about the time, or shortly before the locations by the Alexanders; that about the 1st day of December, 1839, he forwarded to the general land office his certificate and field-notes for patent, and received for answer from the commissioner, in writing, that his survey could not be admitted to record, because of a previous return of the same land for Samuel Alexander, and because his field-notes had not been examined in the proper county; that Samuel and Jerome B. Alexander had full knowledge at the time they made their locations, in January, 1839, of his claim and equitable right to the land, which was at that time publicly known, and the land called "the Chadoin league;" that the Alexanders located the same in fraud of his rights, and that he had used proper diligence to perfect his title, &c.

Upon these issues and the proofs submitted there were a verdict and judgment for the appellee, from which this appeal is prosecuted.

The assignment of errors is, "that the court erred in overruling the motion for new trial for each and all the reasons therein stated." And, looking to the motion and the errors therein complained of, the questions presented for our decision are, 1st, the validity of appellee's equitable right; 2d, the laches with which he is charged in not prose-

cuting his claim with diligence; 3d, the plea in bar of former adjudication; and, 4th, abandonment of his equitable claim by the appellee.

The solution of some of these questions is attended with very considerable difficulty. As to the first point mentioned, it may be premised that there can be no doubt of the original equitable right of the appellee. In the opinion delivered in the case by Mr. Justice WHEELER, when formerly here, he said: "In respect to the question of title, it will suffice for the present to observe that it appears, by the defendant's answer, that he was admitted as a colonist in the colony of Austin and Williams, and was permitted, as we historically know the practice was, to select land already surveyed, and it only remained for the commissioner to issue the title when the land office was closed by the act of the consultation. The application and field-notes of the survey were returned, with the archives of the colony, to the general land office. After the opening of the land office, in 1838, he obtained his certificate. Having obtained his certificate without delay, he had the right, we think, to have it applied to his survey and the land patented to him, if he did not delay making a return to the land office unnecessarily and unreasonably, and until the rights of other parties had intervened, although he had no order of survey. That was dispensed with by the action of the officers in admitting and recording his application and permitting him to select land already surveyed. If, in a properly-directed endeavor to apply his certificate to his field-notes, he was misled and prevented, by the mistake of the commissioner of the general land office, in sending the field-notes to the wrong county, without laches or fault on his part, and if, as soon as he reasonably could obtain information of the mistake, he took proper steps to correct it, his right ought not thereby to be defeated; nor could it be by the intervention of one who, with the knowledge of his right, took advantage of his mistake for that purpose."

By the testimony in the record before us these facts are satisfactorily established.   His admission as a colonist; his application for the 'land placed upon record in the office of 'the *empresarios* just before the closing of the land office in 1835; the transmission of the same, together with the field-notes of the survey, to the general land office; the issuance of his head-right certificate by the board of commissioners for Washington county; the examination, certification, and proof of field-notes, and the payment of government dues in Colorado county, are facts established beyond question; and it is almost equally certain that the commissioner of the land office did mislead the appellee, by transmitting to the county of Colorado, instead of the county of Fayette, a certified copy of the field-notes of the survey which he had selected.

In proof of this, there was read upon the trial a certified copy of a letter from John P. Borden, commissioner of the general land office, to James P. Hudson, surveyor of Fayette county, as follows:

" GENERAL LAND OFFICE,

" CITY OF HOUSTON, *December* 7, 1838.

"J. P. HUDSON, Esq.: This to inform you that the league of land situated adjoining and below the one granted to William Daniels, on Lavaca, was selected by Thomas Chadoin in 1835, the old field-notes for which, through mistake, have been returned to the office at Columbus, in Colorado county.   C. B. Stewart, the agent, still claims the selection.        Very respectfully,

" JOHN P. BORDEN,

" *Commissioner General Land Office.*"

There is no positive proof that this was sent to the surveyor, but the presumption that it was, may, I think, be fairly indulged.   It was an official letter, giving important information to a subordinate officer, the object of which was to protect the rights of a citizen from molestation, and a copy of which, it is not reasonable to suppose, would

have been retained upon record unless the original had been duly forwarded. But it does prove most conclusively the fact, that the certified copy of the field-notes had been sent from the general land office, by mistake, to the wrong county. Nor is this strange. County boundaries were, before and at that period, but imperfectly defined upon the territory of the country, however accurately they may have been stated in the several acts creating the then existing counties. The county of Fayette was created by act of the congress of the Republic, on the 14th December, 1837, and, so far as there is any testimony upon the subject, no actual survey of the boundary line between that and Colorado county had been made for years after.

If there existed accurate maps of these counties, or even sketches by surveyors, by which the locality of the land could have been determined, either in the one county or the other, it is but reasonable to suppose they would have been found in the general land office; and if the *data* there was so uncertain as to have misled the commissioner in his attempt to send a certified copy of the field-notes to the proper county, it would be most unreasonable and manifestly unjust to hold the appellee responsible because he did not possess superior knowledge.

The difficulties and confusion resulting from this uncertainty with regard to county boundaries is a part of the history of the times, and no doubt the immediate cause and chief reason for legislation, which was intended to remedy the evil.

The 2d section (Hart. Dig., Art. 1877) of the act of the 5th February, 1840, provides, "that hereafter, when any change may take place in the boundaries of any county, it shall be the duty of the surveyor of any county, from which territory may be so taken, to furnish the surveyor of the county including such territory with a full and complete copy of all the field-notes made in the same."

If this law had existed at the date of the proof of appel-

lee's field-notes, and had been complied with, the probability is that the difficulties which he encountered would have been avoided. That portion of Fayette county in which the land in controversy lies was taken from Colorado county when the former was created.

The party (C. B. Stewart) referred to by Borden, the commissioner, in his letter to Hudson, the surveyor of Fayette county, testifies by deposition at great length, and among other things states that he, as the agent of Chadoin, caused the field-notes to be proved up in Colorado county, and applied his (Chadoin's) head-right certificate to the field-notes of the survey made by Hensley before the closing of the land offices in 1835, and gave them to him (Chadoin) to enable him to take such other steps as were necessary to complete his title; that he paid, or caused to be paid, the government dues on said land, and also the surveyor's fees of $48 to Hensley; that he procured also from the commissioner of the land office (Borden) a certified copy of Chadoin's application for the land, which he also delivered to him.

The fact is established, with reasonable certainty, that the commissioner of the land office did commit a mistake in sending the certified field-notes of the survey of the land made by Hensley to Colorado county, for he states in his letter that they were sent to the wrong county; and the deposition of one H. Hersperger, taken in 1853, states that he is at that time surveyor of Colorado county; that most of the field-notes of lands in that county appear of record in his office; that there are some field-notes of surveys made prior to the opening of the land offices in 1838, not so recorded, but certified to by the commissioner of the land office; that the field-notes of league No. A, (the one in controversy,) signed by William R. Hensley, lying on the Lavaca, appear of record in his office, certified to by the chief clerk of the general land office; and that it was also certified that the same had been applied for by Thomas

Chadoin, and sets out in his deposition a copy from the records of his office.

The proof is, that the land is very near the boundary line between Colorado and Fayette counties. That the appellee was misled by this mistake of the commissioner, is the natural and inevitable conclusion, and I concur fully with Mr. Justice WHEELER, that "if, in a properly-directed effort to apply his certificate to his field-notes, he (the appellee) was misled and prevented by the mistake of the commissioner of the general land office in sending the field-notes to the wrong county, without laches or fault on his part, and if, as soon as he reasonably could obtain information of the mistake, he took proper steps to correct it, his right ought not thereby to be defeated. Nor could it be by the intervention of one who, with the knowledge of his right, took advantage of the mistake for that purpose."

The receipt to appellee from W. Daniels, receiver of public dues, and president of the board of land commissioners for Colorado county, bears date the 23d June, 1838, and I have no hesitation in asserting that down to this date the appellees had a subsisting and valid right to title for the land in controversy, unimpaired by the mistake of the commissioner.

But it is contended that, whatever his rights may have been, they were lost by his criminal negligence in failing, for an unreasonable time, to prosecute and perfect his title. What, then, were the duties which he was required to perform, and within what time must he have performed them?

He was relieved from the requirements of the last clause of the 12th section (Hart., Art. 1847) of the act of the 14th December, 1847, which provides that "all orders of surveys of head-rights procured under the colonization laws, previous to the declaration of independence, shall be submitted to the examination of the land commissioners," &c., for the reason that he had no order of survey, and needed

none; he had a survey with the field-notes returned to and made a part of the archives of the general land office.

But it is objected that he failed to comply with one of the provisions of the 19th section of the land law of 1837. (Hart. Dig., Art. 1855.) It was proved by Stewart that, in conformity to instructions from the commissioner of the land office himself, the field-notes of the appellee were certified to by Hensley and proved by two of the chain-carriers, &c. It might be somewhat doubtful as to what was meant by the term "certified," if left without any extrinsic fact to aid in its solution, but the meaning is made clear by reference to the receipt of Daniels, the receiver of government dues, and president of the board of land commissioners for Colorado county, to whom, by the mistake already noticed, the return was made, which in other respects was in strict compliance with the law.

It runs thus: "Received, Columbus, Colorado county, June 23, 1838, from Thomas Chadoin, $36 50 in audited paper, in treasury draft, $48, No. 1857, in full, for dues to government upon the league of land upon the Lavaca, returned by W. R. Hensley, under oath, to the office," &c., &c. The survey was, therefore, as is manifest from this official statement, sworn to, and the law in this respect complied with. And it is the fair presumption that the oath contained what the law required, and this presumption is strengthened by the fact that proof by two witnesses was made in addition to the surveyor's oath, as required by law in cases of surveys made prior to the closing of the land offices by the consultation. (Hart. Dig., Art. 1855.)

There remained but one other duty for the appellee to perform, and that was to transmit to the general land office his certificate and field-notes, together with his receipt for government dues, to entitle him to a patent. That this final duty was performed by him in the latter part of the year 1839 is established by the following letter

from the commissioner of the general land office, which was admitted in evidence without objection:

> "General Land Office,
> "*Austin, January* 10, 1840.

"Mr. Thomas Chadoin.

"Sir: The field-notes of a league of land, as returned for you, have just come to hand, but on account of a previous return of the same land for Samuel Alexander, together with the fact of yours not having been examined in the proper county, renders it impossible for your survey to be admitted to record in this office. Under date of the 10th ultimo, I informed Mr. Stewart of the necessity of having a judicial investigation of the rights of each.

> "Very respectfully,　　　John P. Borden,
> "*Commissioner General Land Office.*"

Writing on the 10th of January, 1840, he says: "Under date of the 10th ultimo (10th December, 1839) I informed Mr. Stewart (who it will be remembered was the agent of Chadoin) of the necessity of having a judicial investigation of the rights of each."

The fact is thus established, that at least as early as the 10th December, 1839, the certificate and field-notes of the appellee had reached the general land office; and we are now to inquire whether the delay of their return until that date is, *prima facie*, such criminal negligence as to effectually destroy his equitable right to the land.

This question of diligence in the prosecution of claims of an equitable character is not controlled by any rule fixing a definite period of time within which such acts as are necessary to consummate the right are to be performed, but depends for the most part and always, when not controlled by positive statutory regulation, upon the facts and circumstances of the particular case. The rule is, that if the effort to perfect the right is not delayed beyond a reasonable time, in view of the facts and circumstances which surround the case, there is no laches and no right impaired.

What might be very properly regarded as gross negligence, under very favorable circumstances for the prosecution of such rights, would be excused under a different and adverse state of facts.

I am not apprized of any statute of the Republic of Texas, in 1838, which required the appellee to return his certificate and field-notes of the survey to which it was applied, to the land office within any specified time.

The first act of the Republic fixing a time for the return of field-notes was that of February 5, 1840, entitled "An act to provide for the return of surveys, for the collection of government dues on lands, and for other purposes;" the first section of which declares, "that all surveys heretofore made shall be returned as required by law, and with the government dues paid thereon, to the general land office, by the first day of January next, (1841;) and all surveys hereafter made shall be returned as above, within nine months from the date of the survey, otherwise they shall be null and void, and subject to relocation."

This act cannot of course apply to the return made by the appellee of his field-notes, for his, as we have seen, were returned as early as the 10th December, 1839, and having been rejected for the reasons assigned by the commissioner—the previous reception of Samuel Alexander's survey being one of the reasons, and which no act of his could change—any further effort for this purpose would have been as senseless as unnecessary. The rights of the appellee were not affected by this act.

But was the delay in returning his field-notes and certificate, made by the appellee, from June, 1838, to December, 1839, unreasonable, and evidence of criminal negligence to the extent of forfeiting his rights? I think not.

This court is bound to know and to take notice of such facts of history relating to the Republic of Texas as are calculated to affect the rights of parties before it.

If the country had been in a state of profound peace,

xxx—42

the citizens free from the molestation of public enemies and the dangers and annoyances of savage foes, the facilities for traveling from point to point easy and expeditious, the charge of laches might be heard against the appellee if made by an innocent locator without previous knowledge of his rights. But the very reverse is true. The frontier inhabitants were surrounded with innumerable difficulties, which demanded the constant exercise of fortitude, patience, and watchfulness to overcome or avert.

In addition to the privations, inconveniences, and sufferings necessarily incident to the settlement of a new country, in Texas, then, was superadded war by both civilized and savage foes, which the pioneer settlers had to encounter; and it is no figure of speech to say that in 1839, and before and long after that period, in the border settlements, danger lurked in every path and surrounded every home. In traveling to and from the seat of Government, even later than the letter of the commissioner to the appellee, (1840,) it was the custom to wait until such numbers could be collected for the trip as to afford mutual protection; and later than that date, within sight of the capitol at Austin, more than one of its small population fell victims to the audacity and cruelty of hostile savages.

And it was in view of this condition of the country, partly if not mainly, without doubt, that the policy of the Government was based, as indicated by continuous legislation upon this very subject of the return of field-notes. The act of the 5th February, 1840, as has been seen, required all surveys theretofore made to be returned by the 1st January thereafter, and all subsequent surveys to be returned within nine months of the date of survey. By a joint resolution of the 10th December, 1840, the time for the payment of government dues and the return of field-notes was extended twelve months, and again, by joint resolution of the 27th November, 1841, the time was extended for another year, and, as is known to all who

are familiar with the statutes, was by various enactments extended for several years thereafter. Such was the policy of the government. Can it be maintained, then, that the appellee was guilty of laches in delaying the return of his field-notes, even if the appellants were in a condition to plead it? And if the alleged laches is intended to relate to the delay in this respect, the inevitable and conclusive answer is, that the Alexanders had not, during all that time, possession of the land, and the appellants, who claim under them, are therefore in no condition to interpose the plea. (Holman v. Criswell, 15 Tex., 398.)

In this connection it must not be forgotten that even now the only possession which is claimed by any of the appellees is six hundred and forty acres by Magee and wife, which was partitioned to them under the will of Jerome B. Alexander, and they distinctly disclaim possession of any other portion of the league.

The authority of this court, just cited, will be quite as conclusive of the question of the plea of laches, if it is intended to apply to the time which elapsed from the return of (or effort to return) field-notes and certificate by the appellee until the initiatory proceeding in this suit, and for the same reason: there was no possession by the appellants, or those under whom they claim, until the possession by Magee and wife in 1850, and immediately thereafter these proceedings were commenced.

But the appellees are not entitled to this defense even if it were true. They can claim no higher right than was possessed by the patentees under whom they claim, Samuel and Jerome B. Alexander, and are subject to the same equities.

It is abundantly proved, and not controverted, that said Alexanders made their locations with a full knowledge of the appellees' claim and the nature of it. First, it is proved by six or more witnesses, old citizens, that for several years previous to the location of the Alexanders the league of

land in controversy was known as "the Chadoin league," as "Chadoin's head-right league," as "the league granted him as a colonist of Austin and Williams' colony." The deposition of Thomas Green is to the effect, that he was the predecessor of Hudson as surveyor of Fayette county; that, in the early part of 1838, he received a note signed Thomas Chadoin, in which it was stated that a league of land which was about being located by one Jones was his, and had been granted to him before the war as his head-right; and that he, Green, did not survey, or have surveyed, the league during his administration; thinks Samuel Alexander located the land in the latter part of the year 1838.

The witness, C. B. Stewart, who acted as the agent of the appellee, testifies in the most explicit manner to the knowledge of the Alexanders of the appellees' claim. He conversed with them directly upon the subject. He states that, from his conversation with them, he "knows they had knowledge of Chadoin's claim; that, having heard of the locations made by them, he went to see them; that he mentioned to Jerome Alexander that Chadoin's claim was the oldest; that he had entered it as a colonist of Austin and Williams before the war broke out; that the colonists had always respected each others' claims, &c., &c.; that Alexander said in reply, 'that he knew Chadoin had claimed it as a colonist league before the war, but that he had not taken the right steps to secure it under the law; that he (Alexander) acted under advice, and would not give it up; that some other person would take it if he did not,'" &c. The witness proceeds to say: "I next saw the elder Alexander, (Samuel,) his father; he replied to the same effect as did Jerome, and further said that Chadoin would have lost it any how," &c., &c.

Actual notice of the appellees' claim at the time of their location being thus fixed upon the Alexanders, the issuance of the patents to them could in no manner affect the valid-

ity of the appellees' older equitable claim.   (Commissioner
v. Smith, 5 Tex., 471.)

The locations of the Alexanders, having been made with
full notice of the appellees' prior equity, was fraudulent,
and could not be validated by the issuance of patents.
(Howard v. Perry, 7 Tex., 266.)

The views here presented are also fully sustained by
Morris v. Byers, 14 Texas, 278.

The record of the former suit pleaded in bar discloses
that the appellee filed his petition in the district court of
Fayette county on the 16th May, 1840, in which he sets
out his emigration to Texas in 1829; that he remained as
a citizen of Texas at the date of the declaration of inde-
pendence, and has performed all the duties of a citizen
since that time; that in 1835 he made application to the
proper authorities for a league of land on the Lavaca,
being one of a number previously surveyed by William R.
Hensley, and sets out the field-notes at length, the league
now in controversy; that, owing to the breaking out of the
revolution, he failed to obtain a grant; that since the revo-
lution he has taken out a certificate, as required by the
land law, has had the field-notes examined, and paid the
government dues on the land, and done all other things
required by our land law to perfect his title to the land;
that notwithstanding all this one Samuel Alexander, in-
tending to wrong him, has fraudulently made application
to the county surveyor of Fayette county, and has entered
and obtained a survey of said league of land, and that the
field-notes and certificate of said Alexander have been
returned to the general land office, and that he fears a
patent will issue to Alexander unless the commissioner of
the land office is restrained, &c., and prays for a writ of
injunction to restrain the commissioner from issuing the
same, and that Alexander may be made a defendant, and
for such other and further relief as the nature of the case
may require.

The injunction was awarded, and bond given in accordance with the fiat of the judge. There is no writ of injunction in the record, nor any evidence that it was served or that it was ever issued.

Alexander made an appearance and entered a general demurrer or exception, as follows: "And the said defendant comes," &c., "and says that the petition of the said plaintiff is not sufficient in law. Wherefore he prays judgment that the same may be dismissed."

He also filed an answer, setting up his location and survey, and denying the right of the petitioner, (Chadoin,) and that the injunction may be dissolved, and that he be dismissed with his reasonable costs, &c.

Upon these pleadings the court, at the November term, 1840, rendered this judgment, after stating the style of the case: "In this case come the parties by their attorneys, and both sides being heard on a demurrer to the plaintiff's petition, it was ordered by the court that the demurrer be sustained, the injunction dissolved, and that the defendant recover of the plaintiff his costs in and about his suit in this behalf expended." The plaintiff then, by his attorney, moved the court for leave to amend his petition. Motion rejected.

Such is the judgment pleaded in bar of the appellee's equitable right.

The question here presented is by no means free from difficulty under our system of pleading and practice.

There are reasons to my mind very obvious why this plea of *res adjudicata* should be more cautiously received under our system than is necessary under the common-law system of pleading. The want of certainty in ours makes it not unfrequently difficult, if not impossible, to determine what issues have been joined, and the precise rights which have been adjudicated. And more especially is this true of the proceedings of the courts of our late Republic, at a time when it can be safely asserted there was no fixed and

understood system of pleading or practice, either by stat-utory enactment or by settled and uniform judicial decis-ions; and I think that, as to the judicial proceedings and judgments had at that period, it would be unwise to apply very rigidly rules borrowed from an old and well-matured system, in which the utmost certainty attainable by human reason is demanded.

Our blended law and equity jurisdiction enables parties litigant to embrace in the same suit more than one cause of action or defense, which would be incongruous and in-admissible under a different system, and perhaps the widest range known to any system is tolerated in the form and scope of our pleadings.

But I do not think it follows that this latitude has gone, or is likely to go, to the extent of compelling parties who have several rights of action against the same party, of distinct and different character, growing out of separate and distinct transactions, to blend them in the same suit, on pain of being barred as to those not included, nor is this the meaning of the rule, as I understand it, laid down by Mr. Justice LIPSCOMB, in Foster v. Wells, 4 Tex., 101, to wit, that the judgment or decree of a court of compe-tent jurisdiction shall be final, not only as to the matter determined, but also as "to every other matter which the parties might litigate in the cause, and which they might have had decided."

Nor is it believed that the rule will apply so as to defeat a trial upon the merits, because of a former suit between the parties upon the same subject-matter, where no adju-dication upon the merits is sought or prayed for by either party, in which a judgment upon a general exception was rendered, merely dissolving an injunction which had been previously awarded against a third party having no inter-est in the suit, and awarding costs, &c.

Our system, it is true, disfavors a multiplicity of suits, and, when the proper parties are brought before them, the

courts will hear and finally determine all of the rights of the parties touching the subject-matter, if properly presented, whether such was the original intention of the parties or not; but if, as in the case here pleaded in bar, neither party demands judgment of the court upon the merits of the respective rights claimed, while either might, are the parties not equally to blame? There was nothing to prevent Alexander, in that suit, from invoking the judgment upon his right to title as against the plaintiff, Chadoin. Either party had the undoubted right to insist upon a final determination of the whole subject-matter; but if neither sought this final determination, and the judgment of the court should appear to have been upon the merits of a mere preliminary question, does it follow that they are both forever barred because they might have had such final determination? It seems to me that this would be pressing the rule too far.

But it is insisted for the appellants that this was a judgment upon the merits, and is as conclusive as if rendered upon a hearing of the facts by the court or upon verdict. It is an admitted principle, that a demurrer admits all the facts well pleaded, and demands the judgment of the law upon those facts; and when the judgment is pronounced, it must be conclusive upon the parties, and as effectually determine the litigation as if judgment had been rendered on verdict. (1 Chitty's Plead., 198.)

But there is this difference to be observed between judgments upon verdict and judgments upon demurrer, the former are certain as to what was intended to be decided, however inartificially drawn, whereas the latter are often of very doubtful construction, leaving it difficult to determine whether the judgment was intended to sustain the demurrer as to all the matter demurred to or only partially; and the judgment relied on as a bar in this case illustrates this difference very forcibly.

The judgment of the court is, that the demurrer to the

plaintiff's petition be sustained, the injunction dissolved, and that the defendant recover of the plaintiff his costs, &c.   The plaintiff's petition is not dismissed, nor is the defendant allowed to go hence without day.   The only definitive points of the judgment are, the dissolution of the injunction and the award of costs against the plaintiff, and this was proper, if only the dissolution of the injunction was intended.   The point of inquiry is as to the scope and effect intended by the court to be given to the judgment.   Was it intended to reach and decide the question of right to the land as set forth in the plaintiff's petition; and for the purpose of ascertaining this fact, left uncertain by the judgment itself, it is said that parol or oral testimony be introduced, not to contradict, but to explain what was decided by the court.   (Graves v. White, 13 Tex., 126.)

No witness was called to testify upon this point, nor other evidence offered upon the subject; nevertheless, the record does contain evidence, offered by the appellants for another purpose, which conduces most strongly to prove that the judgment pleaded in bar was not intended by the court and not understood by the parties to be a judgment upon the merits.   This evidence consists of the records of two several suits to try title to the land in controversy, commenced by the appellee in the district court of Fayette county, on the 4th of March, 1844, one against Samuel Alexander and the other against the widow and. heirs-at-law of Jerome B. Alexander, including the present appellants, invoking the judgment of the court as between his equitable right to the land in controversy and the apparent legal title of the defendants in the respective suits.   And on the 28th September, 1844, the defendants, respectively, in said suits, pleaded specially by exception and generally to the merits of said actions, fully setting forth their legal titles acquired under the patents issued to Samuel and Jerome B. Alexander, and invoked the judgment of the

court thereon as against the equitable title of the appellee.

These suits continued pending in the Fayette district court until the April term, 1847, when they were heard upon the special pleas of the defendants, which were considered by the court as demurrers, and they being overruled, and the parties generally having leave to amend, the plaintiff in the causes, for some reason not known, and which is wholly immaterial, took a non-suit in each of the cases.

These records were introduced in evidence by the appellants as evidence to support their plea of abandonment by the appellee of his claim to the land in controversy, and, being a part of the evidence in the case, we have a right to look to it to aid in the determination of any question presented in the record.

Now, it does seem that if, as is now contended, the judgment of 1840, rendered in the same court, was intended and understood to be a judgment upon the merits and conclusive of the rights of the parties, the appellants would not have failed in the other suits, from the 4th March, 1844, to the 16th April, 1847, to interpose the defense; and this is rendered reasonably certain by the fact that the same able and vigilant attorney, well known to this court while living, conducted the case of 1840 for Samuel Alexander, and the defense of the two several suits of 1844 for the appellants and said Samuel Alexander.

This evidence is more satisfactory than the mere recollection of a disinterested party could be, after the lapse of many years, as to what was understood and intended to be the scope and effect of the judgment pleaded in bar.

Besides, if the judgment of 1840 was conclusive upon the appellee, by what right did the appellants bring him into the district court a second time? There was no reason for further litigation if the title had been settled. The plea in bar would certainly have been good, if for anything, to protect the appellants in possession in 1850 against an

action of "forcible entry." The judgment was not final and conclusive, because it left the parties in court. (Keene v. McDonough, 8 Martin, La., 185, 187.)

In a judgment on demurrer, if the reason to be collected from the record appears to have been matter of form, it cannot be pleaded in bar. (1 Blackf., 392, 393.)

But it may be asked what became of the suit of 1840 if, by the judgment then rendered, the parties were still left in court? The answer is, that it abated for want of prosecution, and with precisely the same effect as to the rights of the parties as if it had been a discontinuance or a nonsuit; no legal conclusion could be drawn from it.

The authorities are uniform in declaring that it must clearly appear that the judgment was rendered upon the merits, or it will be no bar.

As to the plea of abandonment, I deem it only necessary to say, that the prosecution of a suit or suits for three years manifests at least some confidence in the right prosecuted, and that a non-suit is without prejudice to any future action; and if it could be known that the appellee had it in his mind at the moment of dismissal to abandon his claim, there is certainly no law to have prevented him from subsequently changing his mind. If he had made public declaration of abandonment, and third parties had been thereby induced to purchase, he would be bound by his declaration as to them.

In disposing of the points raised by the appellants, it was found impracticable to take them up in the order in which they are presented. The assignment of error referred to the grounds embraced in the motion for new trial, and, looking to these, we are referred to instructions given and refused by the court and to the bill of exceptions.

The first ground for new trial is as to the rulings of the court upon the record of the judgment pleaded in bar, and that part of the fifth charge given by the court, and to the fourth charge which was given. The bill of exceptions

states that, after the record pleaded in bar had been read in evidence, the court remarked, in the hearing of the jury, that the attorneys had filed an agreement that the case should be tried upon the merits, and that the matters relied upon in the pleadings of the plaintiffs, founded upon said suit, the transcript of which was read in evidence, did not reach the merits. This being the conclusion arrived at by the court, the exception cannot be sustained. The fourth and fifth charges complained of are in perfect harmony with the views expressed in this opinion upon the matters to which they relate. The substance of these instructions is, that if the jury find from the evidence that the appellee selected the land in 1835 to which he afterwards, in 1838, applied his head-right certificate and paid the government dues, and that the commissioner of the land office did return the field-notes of the survey to Colorado county by mistake, and that the appellants knew of Chadoin's claim and of the mistake, then Chadoin is not in fault, and that if, with such knowledge, they subsequently located the land, such location was in fraud of the rights of the appellee, and they must find in his favor. If the view we have taken of the case be correct, these instructions embrace the law.

The second ground for new trial is, that the court refused the instructions asked by the appellants to be given to the jury from the 1st to the 21st, inclusive. The court below, after giving the instructions 4 and 5, asked for by the counsel for appellee, just noticed, could have done no less than refuse them, for they are, each and all, in most palpable conflict with the instructions which he had given, and which we have said were properly given; besides, they were objectionable in other respects: they are most of them of unreasonable length, argumentative in form, citing authorities in support of the legal effect of assumed facts, and, in structure and matter, a written argument and brief to the court.

The other errors complained of need not be noticed, being subordinate to and included in those which we have briefly noticed.

This is a case of long standing in the courts, and doubtless one of much interest to the parties. It has been carefully examined and considered, with an anxious desire to dispense justice between the parties upon well-founded and acknowledged equitable principles, and in doing this we are constrained to say we are unable to perceive such error in the record as would justify a reversal, and the judgment is therefore

AFFIRMED.